JOANNE H. GREENE and ESTATE OF ROBERT H. GREENE, DECEASED, JOANNE H. GREENE, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greene v. Commissioner
Docket No. 6913-89
United States Tax Court
T.C. Memo 1991-403; 1991 Tax Ct. Memo LEXIS 436; 62 T.C.M. (CCH) 512; T.C.M. (RIA) 91403; August 15, 1991, Filed *436 Decision will be entered for the respondent. J. H. Mitchell, Jr., for the petitioners. Kathryn Vetter and Alan S. Beinhorn, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in Mr. and Mrs. Greene's individual Federal income tax for the tax year ended December 31, 1981, in the amount of $ 137,161. The issue presented is whether the gains on the sale of Mr. Greene's interests in two separate properties qualify for nonrecognition under section 1031. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with the attached exhibits, are incorporated herein. Petitioners resided in San Rafael, California, at the time the petition in this case was filed. A. Background
*437 Mr. and Mrs. Greene filed a joint Federal income tax return for 1981. They did not report their share of the gain realized on the transfer of two properties. The first was located at 1925/45 Francisco Boulevard, San Rafael, California (Francisco Boulevard Property), in which Mr. Greene owned a 40-percent interest. The second was 1.7 acres of undeveloped real estate in Hayward, California (West Winton Property), in which Mr. Greene owned an 85-percent interest. Mr. Greene attempted to structure each transaction to qualify for nonrecognition of the gain under section 1031, through use of a Starker trust. Accordingly, his share of the proceeds from each transaction was placed in a separate grantor trust (Francisco Boulevard Trust or West Winton Trust). Mr. Greene named David J. DeLuca as trustee of each trust. Mr. DeLuca was also employed by Mr. Greene on an at will basis, as controller of Mr. Greene's real estate brokerage. Mr. Greene operated the real estate brokerage as a sole proprietorship. Mr. Greene died on February 28, 1988. B. Sale of Francisco Boulevard Property
1. Sale of the Property and Creation of the Trust
Mr. Greene and the other owners of *438 the Francisco Boulevard Property entered into a purchase agreement with Marin County Employees Retirement Association (MCERA) on December 22, 1980. MCERA agreed to cooperate with the sellers to "effect an IRS Code Section 1031 tax deferred exchange," but nevertheless insisted that the "purchase price [was] to be all cash to Sellers." On March 10, 1981, Mr. Greene and MCERA entered into an Exchange Agreement Amendment and Trust Agreement, wherein Mr. Greene and MCERA agreed that Mr. Greene would transfer his 40-percent interest in the Francisco Boulevard Property to Mr. DeLuca as trustee of the Francisco Boulevard Trust. If an exchange property was not located prior to the sale, MCERA would deposit Mr. Greene's 40-percent share of the proceeds into the Francisco Boulevard Trust. A suitable exchange property was not located prior to the sale. In contravention of the Trust Agreement, however, Mr. Greene did not transfer his interest in the Francisco Boulevard Property to the trustee. Regardless, MCERA paid Mr. Greene's 40-percent share of the net proceeds, $ 467,199, to the trustee of the Francisco Boulevard Trust on March 12, 1981. The trustee was vested with the following powers: *439 (1) To invest the funds in money market certificates or equivalent money fund shares until Mr. Greene located a suitable exchange property; (2) to retain all income received by the trust in the trust account; (3) to acquire the exchange property on Mr. Greene's behalf after being advised to do so by him; and (4) to terminate the trust, and pay over the trust corpus to Mr. Greene "as full consideration for the transfer of [the Francisco Boulevard Property]," if Mr. Greene did not locate an exchange property before March 2, 1983. The trustee was to be paid a fee for providing these services. 2. Operation of the Trust
a. Advances to Mr. Greene
Pursuant to the trust document, the trustee deposited the proceeds of the sale into a money market account in the name of "David J. DeLuca, Trustee for Robert H. Greene." During the period April 3, 1981, through April 25, 1983, the trustee made seven advances from the sale proceeds to Mr. Greene, which totaled $ 298,044. Mr. Greene executed unsecured promissory notes for each of the advances, which were payable on demand and bore interest at rates varying from 8 percent to 15 percent. The trustee continued this arrangement, in *440 spite of his fiduciary obligations to invest only in money market vehicles, based on his knowledge of Mr. Greene's financial position. Mr. Greene used most of the proceeds of the advances for personal purposes. Mr. Greene repaid six of the advances on October 22, 1986, directly to the trust. One of the advances was deemed repaid on March 11, 1982, when Mr. Greene made a payment on behalf of the trust for the purchase of a trust investment property. The interest due on the advances was not paid on a regular basis, or in amounts which represented the interest due to date. The trustee neither refused any loan requests made by Mr. Greene, nor did he enforce the interest payments or make demand for payment on the promissory notes. The trustee paid $ 13,903 to Mr. Greene during 1981, which represented distribution of the income earned by the trust. No such payments were made after 1981. b. Loans to Other Parties
The Francisco Boulevard Trust loaned $ 63,000 to Greene Financial Corporation between October 1, 1982, and December 15, 1982, at Mr. Greene's direction. Greene Financial Corporation was owned by Mr. Greene and his family. These loans bore interest, and were paid *441 in full on October 19, 1983. On June 30, 1981, the trust loaned $ 95,000 to the Marin Freeholders, a partnership of which Mr. Greene owned 50 percent. Again, the advance was made at Mr. Greene's direction. The loan bore interest, and was repaid in full on July 31, 1981. On July 21, 1981, the trust loaned $ 11,510 to Jerry Suyderhood, a real estate broker in Mr. Greene's real estate firm. The loan was made at Mr. Greene's direction. It bore no interest and was repaid on July 23, 1981. On July 2, 1981, the trust loaned $ 20,000 to Harold Holtzinger, friend and business associate of Mr. Greene. The loan was made at Mr. Greene's direction. It bore interest and was repaid in full on October 1, 1981. The trustee did not investigate the creditworthiness of any individual or entity to whom he loaned or advanced money, but instead relied on Mr. Greene's direction.
c. Real Estate Purchases by the Francisco Boulevard Trust
1. Linda Vista Avenue
Mr. Greene entered into a joint venture agreement with Richard and Marie Parkinson (Parkinson) on July 27, 1981, for the development of property at 17 Linda Vista Avenue, Tiburon, California. Mr. Greene caused the Francisco Boulevard *442 Trust to pay $ 334,194 for development of the property. Nowhere in the Joint Venture Agreement (the Agreement), or in the grant deed through which Parkinson contributed the land to the joint venture, was the Francisco Boulevard Trust mentioned. The Agreement refers to Mr. Greene as a joint venturer, not the trust. In spite of this, the trustee considered this property to be a trust investment, notwithstanding the limitation on the types of trust investments allowed by the trust agreement (i.e., money market vehicles). When the joint venture was dissolved on September 17, 1982, Mr. Greene took title to the liquidating distribution in his name, not that of the trust. Mr. Greene arranged for a loan against the property on September 29, 1982, after the joint venture was dissolved. The proceeds of this loan were deposited into the trust money market account. The trust reported the income and expenses (including depreciation) [2] of the property on its annual fiduciary income tax returns. When the property was sold on December 23, 1986, the trust reported the gain on the transaction. *443 2. Pebble Creek Condominiums
Mr. Greene purchased five condominium units in Pebble Creek Condominiums, Denver, Colorado, on March 5, 1982. Mr. Greene made an aggregate downpayment of $ 10,350 for them, and the seller financed the remainder of the purchase price. The trustee considered this property to be in exchange for the Francisco Boulevard Property, and deemed the $ 10,350 paid by Mr. Greene to be interest expense paid to the trust on account of the previous advances made to Mr. Greene. The trustee was not a party to any contract concerning the Pebble Creek Condominiums. The units were purchased in Mr. Greene's name, and he reported the income and expenses from the Pebble Creek Condominiums on his individual income tax return. 3. Coldwater Canyon Property
Mr. Greene purchased an additional property at 2155 Coldwater Canyon, Los Angeles, California, on February 9, 1984. He paid a downpayment of $ 5,000 from his own funds, and the trustee paid $ 49,000 on April 16, 1984. Mr. Greene adjusted his basis in the Coldwater Canyon property to reflect deferral of the gain on the Francisco Boulevard Property. The income and expenses for the property were reported on *444 Mr. Greene's individual income tax return. The trustee was not a party to any contract concerning the Coldwater Canyon Property, nor did he participate in any of the negotiations. C. Sale of West Winton Property
1. Sale of the Property and Creation of the Trust
Mr. Greene and the other owners of the West Winton Property entered into a Real Estate Purchase Contract with Messrs. Y. C. Yang and E. H. DeWolf (Yang and DeWolf) on November 21, 1980. The buyers of the property agreed to cooperate with the sellers to "effect an IRS Code section 1031 tax deferred exchange," but nevertheless insisted that the "Purchase price [was] to be * * * all cash." On February 6, 1981, Messrs. Greene, Yang, and DeWolf entered into an Exchange Agreement Amendment and Trust Agreement, wherein the parties agreed that Mr. Greene would transfer his 85-percent interest in the West Winton Property to Mr. DeLuca as trustee of the West Winton Trust. If an exchange property was not located prior to the sale, the buyers would deposit Mr. Greene's 85-percent share of the proceeds into the West Winton Trust. A suitable exchange property was not located prior to the sale. Accordingly, Yang and DeWolf *445 paid Mr. Greene's 85-percent share of the net proceeds, $ 145,970, to the trustee of the West Winton Trust on February 9, 1981. The trustee was vested with the following powers: (1) To invest the funds in money market certificates, or equivalent money fund shares, until a suitable exchange property was located by Mr. Greene; (2) to retain all income received by the trust in the trust account; (3) to acquire the exchange property on Mr. Greene's behalf, after being advised to do so by him; and (4) to terminate the trust, and pay over the trust corpus to Mr. Greene, "as fair consideration for the transfer of [the West Winton Property]," if Mr. Greene did not locate an exchange property before February 6, 1983. The trustee was to be paid a fee for these services. 2. Operation of the Trust
a. Advances to Petitioner
Pursuant to the Trust Agreement, the trustee deposited the proceeds of the sale into a money market account in the name of "David J. DeLuca, Trustee for Robert H. Greene." During the period February 18, 1981, through April 3, 1981, the trustee made three advances from the sale proceeds to Mr. Greene which totalled $ 93,500. Mr. Greene executed unsecured promissory *446 notes for each of the advances, which were payable on demand and bore interest at rates varying from 13 percent to 18 percent. The trustee continued with this arrangement, in spite of his fiduciary obligation to invest only in money market vehicles, based on his knowledge of Mr. Greene's financial position. Mr. Greene deposited all of the proceeds of these advances into his personal bank accounts. Mr. Greene repaid $ 60,000 on February 2, 1982, $ 1,176 of which was classified as interest on the loans. On February 3, 1982, he paid $ 10,000, all of which was deemed to be interest. The balance of the amount advanced to Mr. Greene by the West Winton Trust was deemed repaid on March 8, 1983, when he purchased a putative exchange property. The interest due on the advances was not paid on a regular basis, or in amounts which represented the interest due to date. The trustee did not refuse any loan requests made by Mr. Greene, nor did he enforce the interest payments or make demand for payment on the promissory notes. The trustee paid $ 4,289 to Mr. Greene during 1981 and 1982, which represented distribution of the income earned by the trust. b. Real Estate Purchases by the West *447 Winton Trust
1. Baldwin Avenue
Mr. Greene purchased a 42.5-percent interest in a commercial rental property located at 8388-8400 Baldwin Avenue, Oakland, California (Baldwin Property) on February 16, 1982. This property was considered by Mr. Greene and the trustee to be in exchange for the West Winton Property. The trustee withdrew $ 125,000 from the Trust money market account to complete Mr. Greene's purchase. Mr. Greene reported his share of the joint venture's loss on his individual income tax return. The trustee was not a party to any of the contracts concerning the Baldwin Property, nor did he participate in any of the negotiations. 2. 3 Gate 3
Mr. Greene purchased a commercial rental property known as 3 Gate 3, in Sausalito, California, on March 8, 1983. This property was considered by Mr. Greene and trustee to be in exchange for the West Winton Property. The purchase was completed in Mr. Greene's name, with his own funds and a mortgage loan from the sellers of the property. The trustee was not a party to any of the contracts concerning the 3 Gate 3 property, nor did he participate in any of the negotiations. OPINION The general rule regarding recognition *448 of gain or loss on the sale or exchange of property is found in section 1001(c), which provides, "Except as otherwise provided in this subtitle, the entire amount of the gain or loss * * * on the sale or exchange of property shall be recognized." An exception to the general rule is found in section 1031(a), which provides in relevant part that if property held for investment is exchanged solely for property of like kind which is also to be held for investment, then no gain or loss shall be recognized on the exchange. A. Requirements for Section 1031 Nonrecognition
To qualify for nonrecognition, a taxpayer must satisfy (1) the underlying purpose, and (2) the specific requirements of section 1031(a). Bolker v. Commissioner, 760 F.2d 1039, 1044 (9th Cir. 1985), affg. 81 T.C. 782 (1983); Chase v. Commissioner, 92 T.C. 874, 881 (1989); Magneson v. Commissioner, 81 T.C. 767 (1983), affd. 753 F.2d 1490 (9th Cir. 1985); sec. 1.1002-1(b), Income Tax Regs.
1. Underlying Purpose of Section 1031
The underlying purpose of section 1031 is to defer taxation of gains wherein the taxpayer's *449 economic situation after the exchange is fundamentally the same as it was before the transaction occurred. "If the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not * * * charged with a tax upon his theoretical profit." H. Rept. No. 704, 73d Cong., 2d Sess. (1934), 1939-1 C.B. (Part 2) 554, 564. * * * The underlying assumption of section 1031(a) is that the new property is substantially a continuation of the old investment, still unliquidated. Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 268, 2 L. Ed. 2d 743, 78 S. Ct. 691 (1958.)
Koch v. Commissioner, 71 T.C. 54, 63-64 (1978). 2. Specific Requirements of Section 1031
To satisfy the specific requirements of section 1031(a), and thereby qualify for nonrecognition, the transaction must be a reciprocal transfer of property, as distinguished from a transfer of property for money consideration only. [3]Sec. 1.1002-1(d), Income Tax Regs. "The very essence of an exchange is the transfer of property between owners, while the mark of a sale is the receipt of cash for the property." Carlton v. United States, 385 F.2d 238, 242 (5th Cir. 1967). *450 Therefore, a transfer for anything other than like kind property is excluded from the ambit of section 1031. Biggs v. Commissioner, 632 F.2d 1171, 1176 (5th Cir. 1980), affg. 69 T.C. 905 (1978); Estate of Bowers v. Commissioner, 94 T.C. 582, 589 (1990). Mere reinvestment of cash proceeds from the sale of one property into a second like kind property will not qualify as an exchange under section 1031, even if the reinvestment is made immediately. Coastal Terminals, Inc. v. United States, 320 F.2d 333, 337 (4th Cir. 1963); Carlton v. United States, 385 F.2d at 242; Estate of Bowers v. Commissioner, 94 T.C. at 589. *451 Deductions and exemptions from tax are matters of legislative grace and must be narrowly construed. Estate of Bowers v. Commissioner, 94 T.C. at 590, and cases cited at n. 2 therein. However, courts have liberally construed section 1031 and have allowed multiple-party transactions, Barker v. Commissioner, 74 T.C. 555 (1980); Biggs v. Commissioner, supra; nonsimultaneous exchanges, Starker v. United States, 602 F.2d 1341 (9th Cir. 1979); deposit of sale proceeds into an escrow account before an exchange property is located, J. H. Baird Publishing Co. v. Commissioner, 39 T.C. 608 (1962); transactions in which the intermediary did not acquire legal title to the exchange property, Biggs v. Commissioner, supra; and change from a sale transaction to an exchange transaction even though the property to be received on the exchange was not identified as of the date the original agreement was made. Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962). On the surface, the transactions at issue in this case appear to qualify as exchanges *452 under section 1031. However, courts have recognized that this liberal interpretation of section 1031 should be limited. At some point, the confluence of some sufficient number of deviations will bring about a taxable result. Whether the cause be economic and business reality or poor tax planning, prior cases make clear that taxpayers who stray too far run the risk of having their transactions characterized as a sale and reinvestment.
Barker v. Commissioner, 74 T.C. at 563-564. See also Carlton v. United States, supra (taxpayer received cash, even though the transaction was intended to be an exchange, simply to avoid unnecessary duplication of titles and related costs -- section 1031 not applicable); Rogers v. Commissioner, 44 T.C. 126 (1965), affd. per curiam 377 F.2d 534 (9th Cir. 1967) (buyer of property exercised an option to buy the property from taxpayer just before option was to expire; taxpayer arranged to exchange property with another party upon expiration of the option -- section 1031 not applicable). B. Transfer of Francisco Boulevard and West Winton Properties were not Like *453 Kind Exchanges under Section 1031
The transactions at issue do not meet the underlying purpose or specific requirements of section 1031. 1. Underlying Purpose of Section 1031 Not Met
Mr. Greene's money was not tied up in like kind property within a sufficient time after the sale of either the Francisco Boulevard or the West Winton properties to assure that the exchange properties were "a continuation of the old investment." Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 268, 2 L. Ed. 2d 743, 78 S. Ct. 691 (1958). Sale of the Francisco Boulevard property was closed on March 12, 1981. In spite of the fact that the Trust Agreement called for the Francisco Boulevard Trust to be terminated no later than March 2, 1983, Mr. Greene did not terminate the trust until 1986, more than five years after the underlying "exchange" which created the trust, and more than three years after the trust was scheduled to terminate. Exchange property was not finally located for the West Winton Property until March 8, 1983, more than two years after the underlying "exchange" which created the West Winton Trust. Even though the trust terminated only one month after it was scheduled to do so, the totality *454 of the trust's operation, discussed infra, shows that the properties purchased by Mr. Greene were not in exchange. Arguably, the amount of time that elapses between the sale of one property and the purchase of another is not the sole determinant of whether the two properties were in exchange for one another. [4] Indeed, the Ninth Circuit has sanctioned nonsimultaneous exchanges. Starker v. United States, 602 F.2d at 1355; see also Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 655 (5th Cir. 1968). However, the question is whether the two transactions were integrated. Biggs v. Commissioner, 632 F.2d at 1178; Redwing Carriers, Inc. v. Tomlinson, 399 F.2d at 658; Anderson v. Commissioner, T.C. Memo 1985-205. If the transactions are not integrated, regardless of the taxpayer's intent, they will not be eligible for section 1031 treatment. Smith v. Commissioner, 537 F.2d 972 (8th Cir. 1976), affg. a Memorandum Opinion of this Court. *455 None of the supposed exchanges in either the Francisco Boulevard Trust or the West Winton Trust were integrated. Neither trust held legal title to any exchange property. Although this is not strictly required to allow for section 1031 nonrecognition, Biggs v. Commissioner, 69 T.C. 905 at 916, it would tend to show some connection between the transactions. The trustee did not negotiate for the purchase of any of the exchange properties. In fact, the existence of the trusts was not even disclosed when the putative exchange properties were purchased. Moreover, the buyers of the Francisco Boulevard and West Winton properties in no way participated in the acquisition by Mr. Greene of the exchange properties, even though they both agreed to do so. Cf. Biggs v. Commissioner, 69 T.C. at 917. 2. Specific Requirements of Section 1031 Not Met
Petitioners have conceded that the operation of the trusts does not comport with the specific requirements of section 1031. They assert that the substance of the transactions must be controlling, however, and that mere form is unimportant. Use of this tax law maxim is almost de rigueur for taxpayers *456 arguing for section 1031 treatment. The substance over form doctrine applies where the form chosen by the parties is a fiction that fails to reflect the economic realities of the situation. Commissioner v. Court Holding Co., 324 U.S. 331, 89 L. Ed. 981, 65 S. Ct. 707 (1945); United States v. Cumberland Public Service Co., 338 U.S. 451, 94 L. Ed. 251, 70 S. Ct. 280 (1950). "Transactions which do not vary, control, or change the flow of economic benefits, are dismissed from consideration." Higgins v. Smith, 308 U.S. 473, 476, 84 L. Ed. 406, 60 S. Ct. 355 (1940); see also Chase v. Commissioner, 92 T.C. 874, 881 (1989). However, as Mr. Greene had the freedom to cast the transaction in any manner which he saw fit, he should not be free to cast it aside when he determined, after the fact, that the original form did not meet his needs. Anderson v. Commissioner, T.C. Memo 1985-205. "If the exchange requirement is to have any significance at all, the perhaps formalistic difference between the two transactions [sale or exchange] must, at least on occasion, engender different results. Accord Starker v. United States." Barker v. Commissioner, 74 T.C. at 561. *457 (Citations omitted). See also Swaim v. Commissioner, 651 F.2d 1066, 1070 (5th Cir. 1981). In other words, the form of a transaction cannot be ignored in this analysis. Bell Lines, Inc. v. United States, 480 F.2d 710, 711 (4th Cir. 1973). In both form and substance, these transactions fall short of the specific requirements of exchange treatment. Rather than receiving property in exchange for Francisco Boulevard and West Winton, we find Mr. Greene had constructive receipt of the proceeds of each sale. He used each trust account as his personal bank account, withdrawing money as the need arose. Constructive receipt of income is defined as income made available so that * * * [the taxpayer] may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *
Sec. 1.451-2(a), Income Tax Regs. This doctrine has been applied to section 1031 so that control by the taxpayer over cash proceeds constitutes constructive *458 receipt. Coupe v. Commissioner, 52 T.C. 394, 409 (1969). Mr. Greene "borrowed" $ 298,044 of the $ 467,199 initially deposited into the Francisco Boulevard Trust, and caused an additional $ 189,510 to be loaned from the Francisco Boulevard Trust to business entities in which he owned an interest, or to his friends or business associates. He took outright distributions of $ 13,903 from the Francisco Boulevard Trust. Petitioner "borrowed" $ 93,500 of the $ 145,970 initially deposited into the West Winton Trust, and took outright distributions of $ 4,289 therefrom. None of Mr. Greene's requests for advances were denied, delayed, or modified by the trustee. The Trustee was employed by Mr. Greene on an at will basis, and therefore did not pose a substantial limitation to petitioner's access to the money. Even though the advances were furnished with promissory notes bearing market rates of interest, the trustee did not enforce payment of the interest on any periodic basis. Instead, whenever Mr. Greene needed money to purchase a property, he repaid a portion of either the principal or the interest due to date. No other restrictions were made on Mr. Greene. Petitioners *459 argue that Mr. Greene could have borrowed the money from a third party, given his substantial net worth. This does not impact, however, on the fact that he had unrestrained control over the money. Therefore, we find Mr. Greene had constructive receipt of the proceeds from the sale of the two properties. [5]
In spite of the fact that Mr. Greene intended for these transactions to be exchanges, and *460 structured the trusts in accordance with the liberal construction afforded to section 1031, the trusts were not managed to effectuate his intent. Nonetheless, petitioners argue that section 1031 should be extended so that Mr. Greene's intent to effect a section 1031 transaction will be enough for the transaction to qualify as a nonrecognition event. Courts have shown sympathy for this position, but only when taxpayers act consistently with their stated intent. When actions belie intent, "the intention of * * * [the taxpayer] to effect an exchange does not convert the transfer of the property for cash into an exchange." Carlton v. United States, 385 F.2d at 243; Anderson v. Commissioner, T.C. Memo 1985-205. Mr. Greene did not adhere to the formalities of the trust agreements. Moreover, he used the proceeds as if they were his own. He purchased properties up to three years after the underlying sale, and deemed them to be exchange properties. None of the exchange properties were listed in the trust agreements. The purchasers of neither the Francisco Boulevard Property nor the West Winton Property participated in the purchases of the exchange *461 properties. The existence of the trusts were not disclosed in the purchase of any exchange property. Mr. Greene borrowed money from the Francisco Boulevard Trust for his own use, and did not repay it until five years later. Regardless of Mr. Greene's stated intent, his actions were inconsistent therewith. To reflect our findings and conclusions herein, Decision will be entered for the respondent. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The trust determined its basis in the property based on the amount it paid for development of the property, and after liquidation, the fair market value of the property distributed. At no time did the trust adjust its basis in the property to account for the deferral of the gain on the Francisco Boulevard Property.↩
3. Sec. 1031(b) allows a taxpayer to receive other than like kind property in addition to the like kind property without causing the transaction to be excluded from sec. 1031. However, the taxpayer is required to recognize his or her gain on the transaction to the extent of this "boot" received. Sec. 1031(b); sec. 1.1031(b)-1, Income Tax Regs.↩
4. In 1984 Congress added sec. 1031(a)(3), which provides that a transfer will not be treated as a like kind exchange unless the exchange property is (a) identified within 45 days after the transfer of the underlying property, and (b) received by the transferor within the earlier of 180 days after the transfer of the underlying property or the due date for the transferor's tax return on which the exchange would be reported. Sec. 77(a), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 596. Sec. 1031(a)(3) applies to transactions after July 18, 1984, or to transactions on or before July 18, 1984, if the exchange property was not received before January 1, 1987. Sec. 77(b)(3), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 596. Because Mr. Greene received the putative exchange properties before January 1, 1987, sec. 1031(a)(3) places no time limit on his purchase of the exchanged properties.↩
5. Petitioners cite Rutland v. Commissioner, T.C. Memo 1977-8↩, as standing for the proposition that the doctrine of constructive receipt should be sparingly used, and then only in a clear case. In that case, the taxpayer was obligated to pay interest at one half of 1 percent above the prime lending rate. The Court looked upon this restriction, as well as the forfeiting of rights that would result from actual receipt, to be sufficient restraint on use of the money as to deny constructive receipt. No such restrictions existed in this case; Mr. Greene had complete, unfettered control over the trusts.